UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| VISION CENTER NORTHWEST, INC., )<br>d/b/a VISION VALUES BY DR. TAVEL,)<br>)<br>　　　　　Plaintiff　　　)<br>)<br>　　vs.　　　　　　　　)<br>)<br>VISION VALUE LLC,　　　　　)<br>f/k/a EYEGLASS EXPRESS,　　　)<br>)<br>　　　　　Defendant　　　) | CAUSE NO. 3:07-CV-183 RM |

OPINION AND ORDER

　　This case came before the court on October 30, 2007 for hearing on the motion for preliminary injunction by plaintiff Vision Center Northwest, Inc., d/b/a Vision Values by Dr. Tavel ("Tavel"). Tavel seeks to enjoin defendant Vision Value LLC from using Tavel's claimed trademark, "Vision Values." This opinion and order are meant to satisfy the court's obligations under Federal Rule of Civil Procedure 52(a). For the reasons that follow, the court grants Tavel's motion.

I

　　Tavel began in 1946 as a family owned optical business in Indianapolis. Tavel created the "Vision Values" assumed name in 1974 and began using it actively in Indiana in 1991 in telephone books, print advertisements, promotional materials, and commercials on television and radio. There has been no period since 1991 that Tavel did not use the "Vision Values" name in some way. Tavel

has operated some nineteen "Vision Values by Dr. Tavel" optical stores in Indiana at various times since 1991; those stores offer optical products and services at a reduced price and are not equipped with on-site one-hour labs. In 1993, Tavel opened "Vision Values by Dr. Tavel" stores in Mishawaka, Indiana, and on East Ireland Road in South Bend, Indiana.

In 1996, Tavel installed an on-site one-hour lab at the East Ireland Road "Vision Values by Dr. Tavel" store and changed its name to "Dr. Tavel One Hour Optical." Tavel has maintained a listing for "Vision Values by Dr. Tavel" in the South Bend/Mishawaka telephone book continuously to redirect customers who haven't visited the store since the name change. Tavel also maintains other telephone directory listings in Indiana and has stores and a distribution center in the Indianapolis area.

Eyeglass Express operated an optical store on Main Street in Mishawaka, 7.8 miles from Tavel's Ireland Road store. In February 2007, the store's name was changed to "Vision Value." The name change followed a settlement of lawsuit against David Stanton, now a co-owner of Vision Value, by his former employer (which operates Eyeglass World), in connection with which Mr. Stanton's counsel recommended a name change. No trademark search was conducted; no check of area telephone books was made.

The local newspaper reported in early February that Eyeglass World was becoming Vision Value. Tavel's Ireland Road store manager saw the news story and notified the Tavel home office. Tavel's counsel wrote to Vision Value,

2

demanding that it cease using the "Vision Value" name. Vision Value didn't cease. Instead, it erected a new sign and installed its "Vision Value" awning on its storefront. Tavel filed this suit in April. In August, Lexotica (which owned Pearle Vision) assigned to Tavel all rights in its "Vision Value$" trademark (in courier front in white letters on a black backgrounds inside a rectangle with rounded corners) and "any and all translations, adaptations, derivations, and combinations thereof."

Tavel's Mishawaka store has fielded multiple telephone calls from Vision Value customers calling with inquiries and complaints about Vision Value's products and service. For the first several weeks, angry and confused customers called Tavel at a rate of five a day. Since then, the calls have reduced in frequency, but haven't stopped.

II

>As the party seeking the preliminary injunction, [Tavel] has the burden of demonstrating that it has a reasonable likelihood of success on the merits of its underlying claim, that it has no adequate remedy at law, and that it will suffer irreparable harm without the preliminary injunction; if [Tavel] meets those burdens, the court then must consider any irreparable harm the preliminary injunction might impose upon [Vision Values] and whether the preliminary injunction would harm or foster the public interest.
>A party with no chance of success on the merits cannot attain a preliminary injunction. In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success — in other words, a greater than negligible chance of winning, — but in the second phase, the court evaluates that likelihood of success, as the analysis turns to a "sliding scale" under which a lesser likelihood of success can be made sufficient by a greater predominance of the

3

balance of harms. In performing this balancing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit."

AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803-804 (7th Cir. 2002) (citations omitted).

A

The Lanham Act protects registered marks from interference by state legislation, prevents unfair competition, and protects against fraud or use of reproductions, copies, counterfeits, or colorable imitations of registered marks. Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir. 2001). A trademark needn't be registered for suit under the Lanham Act. Malibu, Inc. v. Reasonover, 246 F. Supp. 1008, 1011 (N.D. Ind. 2003). A plaintiff whose alleged mark is not federally registered has the burden of proving that the alleged mark is valid and so protectable. National Conference of Bar Examiners v. Multistate Legal Studies, 692 F.2d 478, 488 (7th Cir. 1982). To prevail on its claim under the Lanham Act, 15 U.S.C. § 1125(a), Tavel must establish that "Vision Values" is a protectable trademark and that Vision Value's use of the term is likely to cause confusion among consumers. Promatec Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir. 2002).

> The validity of a mark pertains to whether a word, term, name, symbol or device, 15 U.S.C. § 1125(a)(1), is entitled to protection under trademark law by focusing on whether that mark specifically identifies and distinguishes one company's goods or services from

4

>those of its competitors. The infringement of a mark concerns whether the actions of a subsequent user of a substantially similar or identical mark causes a likelihood of confusion among consumers as to the source of those specific goods or services.

Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 727 (7th Cir. 1998). "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." Id. at 726 (*quoting* Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 657 (7th Cir. 1995)).

Vision Value contends that the mark "Vision Values" isn't entitled to protection because it is generic or merely descriptive. Indeed, in arguing the preliminary injunction motion, Vision Value said the "one real issue" is whether this is a protectable mark. Marks are classified into five categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-768 (1992). A generic term is one that is commonly used and one that doesn't identify any particular source: a "mark is generic when it has become the name of a product (e.g., 'sandwich' for meat between slices of bread) or class of products (thus, 'church' is generic)." Te-Ta-Ma Truth Foundation-Family of URI, Inc. v. World Church of the Creator, 297 F.3d 662, 666 (7th Cir. 2002); *see also* Door Systems, Inc., v. Pro-Line Door Systems, Inc., 83 F.3d 169, 171 (7th Cir. 1996) ("A generic term, in the jargon of trademark law, is a word that denotes the product rather than any of the brands

5

of the product."). A descriptive term is one that describes the qualities or characteristics of a particular good or service. Generic and descriptive terms ordinarily can't function as trademarks, *see, e.g.*, Best Buy Warehouse v. Best Buy Company, Inc., 920 F.2d 536, 537 (8th Cir. 1990); Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 81 (7th Cir. 1977), but a descriptive mark may warrant protection if it has acquired secondary meaning by coming "to be uniquely associated with the original seller." Custom Vehicles, Inc. v. Forest River, Inc., 476 F.3d 481, 483 (7th Cir. 2007).

A suggestive mark suggests some characteristic of the goods or services to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of the goods or services. Service Merchandise Co. v. Service Jewelry Stores, Inc., 737 F. Supp. 983, 992 (S.D. Tex. 1990). A term is suggestive if it requires imagination, thought, or perception to reach a conclusion as to the nature of the goods. Vista India v. Taaga, LLC, 501 F. Supp.2d 605, 617 (D.N.J. 2007). An arbitrary or fanciful mark bears no relationship to the product or service with which it is associated. Service Merchandise Co. v. Service Jewelry Stores, Inc., 737 F. Supp. at 992.

Vision Value argues that Tavel tried to register the "Vision Values" trademark and Patent and Trademark Office officials rejected its application because the mark was generic. The court excluded the evidence that might have supported that contention at the preliminary injunction hearing, and no other evidence supports that factual contention. The unrebutted evidence is that Tavel

6

abandoned his application because "Vision Values" was too similar to an existing registered trademark—"Vision Value$"—then owned by Lexotica, which owns Pearle, Inc. The Tavel submission occurred in 1994. As noted already, Tavel acquired the rights to the "Vision Value$" mark in August 2007.

Tavel hasn't alleged that Vision Value is infringing its "Vision Value$" mark. Tavel hadn't acquired that mark when it filed suit and moved for a preliminary injunction, and hasn't amended either the complaint or the injunction request since acquiring the Lexotica mark. But the existence of the registered "Vision Value$" mark is evidence that the phrase "Vision Values" is not merely generic. Had the Patent and Trademark Office considered "Vision Values" generic, the registration would have issued with a disclaimer of both words. Instead, the registration disclaimed only the word "vision."

Vision Value notes the dictionary definitions of vision ("the act or power of seeing") and value ("a fair return or equivalent in goods, services, or money for something exchanged") and that advertisements for both parties depict 50%-off sales that Dr. Lawrence Tavel conceded were "vision values." But clever cross-examination doesn't render generic and unprotectable that which would be suggestive and protectable without the cross-examination. Further, "[w]ords which could not individually become a trademark may become one when taken together. Certain terms may connote more than the sum of their parts and we must take care to decide the genericness of these terms by looking to the whole." Liquid

7

Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 938 (7th Cir. 1986) (internal citation omitted).

"Vision Values" is not generic. It is not the name of a product or class of products. Tavel and Vision Value both offer eye examinations, lens crafting services, eyeglasses, frames, and contact lenses. The mark is suggestive: it alludes to a characteristic of the goods and services; the consumer must use imagination to realize the nature of the goods or services.

Best Buy Warehouse v. Best Buy Company, Inc., 920 F.2d 536 (8th Cir. 1990), *aff'g and adopting* 751 F. Supp. 824 (W.D. Mo. 1989), upon which Vision Value relies, is not to the contrary. That decision noted that many businesses in the Kansas City area used the phrase "best buy" in their advertising; no one was shown to have used "vision values" in South Bend/Mishawaka retail advertising other than Tavel and Vision Value. The Best Buy decision noted evidence that hundreds of businesses across the United States use "best buy" in their business names; the only other "vision value" business disclosed in the preliminary injunction record was not a retail business. The United States Patent and Trademark Office had declined an attempt to register "Best Buy" as a trademark"; that office issued a registration to "Vision Value$."

Success on the merits also requires a showing of commercial use of the mark. Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 434 (7th Cir. 1999) ("A party may acquire a protectable trademark only through use of the mark in connection with its product."). "To establish use, the mark must be attached to

8

the product or service sold to the public and must be continuous and bona fide. As long as there is genuine use of the mark in commerce, ownership may be established even if the first uses are not extensive and do not result in `deep market penetration or widespread recognition.'" Patterson v. World Wrestling Entertainment Inc., No. 03-C-0374, 2006 WL 273527, at *18 (E.D. Wis. Jan. 31, 2006).

Tavel has used the mark "Vision Values" in commerce continuously in Indiana since 1991 and in the South Bend/Mishawaka area since 1993. Tavel has used the mark on store signage, in advertising in print and on the radio, television, the Internet, and vision-related brochures. Vision Value argued in its brief that Tavel doesn't currently use the mark. Tavel hasn't used the term "Vision Values" in the name of its South Bend store for ten years, but continues to advertise in the local market as "Vision Values by Dr. Tavel." Vision Value says the listings are there only because Tavel forgot to cancel the listings, but the evidence at the hearing was to the contrary: Dr. Lawrence Tavel explained that repeat business and referrals from past customers are important to Tavel, and those listings lead such customers to the store. Even if Tavel's South Bend store manager would prefer to drop the listing than continue to field calls from confused and disgruntled Vision Value customers, it remains that Tavel has made continuous commercial use of the mark for the past sixteen years.

Vision Value also argues that a likelihood of success requires proof that the mark has acquired secondary meaning, and Tavel has commissioned no survey

9

to establish secondary meaning. While such a survey may be a common way of proving secondary meaning in a trademark case, a survey is neither required nor the exclusive way of showing secondary meaning. Actual confusion shows at least some amount of secondary meaning, Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 381 (7th Cir. 1976); *see also* Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 728 (7th Cir. 1998) (Wood, J., dissenting: "Actual confusion logically *must* be an indication of at least some amount of secondary meaning.") (emphasis in original)). If there has been actual confusion, Tavel has shown secondary meaning. Accordingly, the court turns first to the issue of confusion.

Consumer confusion is assessed by considering the similarity between the marks in appearance and suggestion, the similarity of the products, the area and manner of concurrent use of the products, the degree of care likely to be exercised by consumers, the strength of the plaintiff's mark, any evidence of actual confusion, and the defendant's intent to palm off its goods as those of the plaintiff. No factor is dispositive and the proper weight given to each will vary in each case. Similarity of the marks, intent, and actual confusion sometimes are described as the most important. Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 462 (7th Cir. 2000); *see also* Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir. 2002) ("the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance").

10

In determining whether two marks are similar, the comparison is made "in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997). The parties' marks are used in the same marketplace, and a side-by-side comparison shows that they're nearly identical—"Vision Values" vs. "Vision Value." These marks are very similar.

When considering whether products are closely related for the purpose of likelihood of confusion, "[a] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Sullivan v. CBS Corp., 385 F.3d 772, 778 (7th Cir. 2004) (internal quotation omitted). The products of Vision Values and Vision Value are almost identical: both companies sell vision care products and offer vision care exams and services. The record does not identify any product or service offered by one party but not the other.

In addressing concurrent use, a court must consider whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir. 1990). Important factors include the relative geographical distribution areas, whether there is direct competition between the products, whether the products are sold to consumers in the same type of store, whether the products are sold in similar sections of a particular store, and whether the product is sold through the same marketing channels. Ty, Inc. v. The Jones Group, Inc., 237 F.3d

11

891, 900 (7th Cir. 2001). Tavel and Vision Value both operate in the South Bend/Mishawaka area and in the retail vision products and services markets. Tavel and Vision Value both have stand-alone stores and they use the same marketing channels.

No information is available on the degree of care exercised by consumers of retail vision products and services.

Tavel's claimed mark is strong. Tavel has used "Vision Values by Dr. Tavel" since 1991 in many areas of Indiana; although the number of "Vision Values by Dr. Tavel" stores has declined, Tavel has continued to use the mark until today. Tavel is among the nation's largest fifty optical retailers, and publications widely read in the industry show Tavel as using Vision Values as one of its optical retail trade names. Tavel has no stores outside of Indiana, but does business nationally.

The preliminary injunction record contains an unusually large amount of evidence of actual confusion. When Eyeglass Express changed its name to Vision Value, the South Bend Tavel office began to receive contacts from people trying to reach, or trying to complain about, Vision Value. The calls reached the point that they distracted Tavel employees from their work. The frequency of such calls has ebbed, but not abated. Although this evidence is less direct, a national commercial shipping firm misdirected a box of eyeglasses to Tavel rather than Vision Value.

The final factor concerning confusion is whether the defendant intended to palm off its goods as those of the plaintiff. "[I]n the trademark infringement context, 'intent' refers to the intent to confuse customers, not merely the intent to

use a mark that is already in use somewhere else." <u>Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F.3d at 1120. Tavel made Vision Value aware of the problem with, and its objection to, the name change from Eyeglass Express before Vision Value actually applied for a permit and arranged for its awnings to be changed. On the other hand, the newspaper article that alerted Tavel of the impending name change said that Vision Value already had stores operating in Michigan and Ohio, reducing the likelihood that Vision Value took its name solely to profit from confused Tavel customers.

On balance, these factors would strongly favor a finding that confusion is likely, at least in Indiana, and so easily satisfy Tavel's burden (at this stage) of showing reasonable likelihood of success on this aspect of its claim. While it is "inappropriate to focus on minor stylistic differences to determine if confusion is likely if the public doesn't encounter the two marks together," <u>Ty, Inc. v. The Jones Group, Inc.</u>, 237 F.3d 898, these marks are nearly identical, the public encounters the marks in the same geographic areas and the same markets, and the companies compete for the same customers. Tavel has established that it has a protectable mark, that a strong likelihood of confusion exists, and that it is likely to succeed on the merits of its claims.

Because quite a bit of actual consumer confusion has been shown, secondary meaning has been sufficiently established.

All of the discussion of confusion relates to the Indiana market, which is Tavel's primary area of operation. Evidence at the preliminary injunction hearing

13

indicated that while all Tavel stores are in Indiana, Tavel does business nationally; no explanation was offered as to the methods of Tavel's conduct of business outside Indiana. Vision Value has or had stores outside Indiana; the Mishawaka store is its only store in Indiana. No evidence at all has been introduced concerning actual or likely confusion outside the State of Indiana. To the extent Tavel might seek an injunction that would apply outside Indiana, it has shown no likelihood of success on the merits.

B

Likelihood of success on the merits is not enough for a preliminary injunction; the plaintiff also must show that it has no adequate remedy at law because it will suffer irreparable injury without preliminary injunctive relief. Campbell v. Miller, 373 F.3d 834, 835-836 (7th Cir. 2004). "An injury is irreparable for purposes of granting preliminary injunctive relief only if it cannot be remedied through a monetary award after trial." East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 703 (7th Cir. 2005). Because "speculative injuries do not justify this extraordinary remedy," id. at 704, "a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries." Id. at 705-706. Tavel must show that without an injunction, it will suffer harm that a post-trial final judgment cannot prevent or fully rectify. Anderson v. U.S.F. Logistics (IMC) Inc., 274 F.3d 470, 478 (7th Cir. 2001). "A plaintiff may suffer irreparable harm if the nature of the loss makes monetary

14

damages difficult to calculate." East St. Louis Laborers' Local 100 v. Bellon Wrecking 8v Salvage Co., 414 F.3d at 705.

Tavel says it has suffered injury to its goodwill and reputation because of Vision Value's unauthorized use of its mark. Evidence at the preliminary injunction hearing supports that claim: consumers are expressing anger at Tavel because of what they see as poor products and service when Vision Value actually provided the product or service. "These types of injuries are presumed to be irreparable because it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." Ty, Inc. v. The Jones Group, Inc., 237 F.3d 891, 902 (7th Cir. 2001) (*quoting* Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir. 1992)).

Tavel has set forth evidence of confusion that has caused and might continue to cause injury to its reputation and goodwill, injury that would be hard to measure monetarily. *See* The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir.1996) ("To show actual confusion [under the Lanham Act], [the plaintiff] must demonstrate that [the defendant's] use 'could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.' ") (*quoting* Lang v. Retirement Living Publishing Co., Inc., 949 F.2d 576, 583 (2d Cir.1991)).

Vision Value says Tavel itself is the source of any harm to Tavel, citing Tavel's "uncorrected phone book listings." Indeed, Vision Value speculates that

15

Tavel might benefit by making sales to customers looking for Vision Value. These arguments are unpersuasive: there is no evidence that Tavel is poaching Vision Value customers, and a mark-holder's continued use of a sixteen-year-old mark despite a months' long entry into the market of one using a variant of the mark is not the sort of conduct trademark law is meant to prevent.

C.

> Once [the movant] is assumed to have shown a reasonable probability (a better than negligible chance) of success on the merits, irreparable harm without the preliminary injunction, and absence of an adequate remedy at law, the court then must consider any irreparable harm the preliminary injunction might impose upon [the party to be enjoined] if the preliminary injunction is issued, and whether the preliminary injunction would harm or foster the public interest.
> The court appraises the risk of irreparable harm to the parties not simply by reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to [the movant] and the public if the trial reveals that [the movant] is entitled to relief; and what irreparable harm will the granting of an injunction do to [the party to be enjoined] and the public if the trial reveals that [the movant] is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance of harms needs to favor that party.

AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 831 (7th Cir. 2002) (citations omitted).

The record doesn't indicate that Tavel actually is losing business to Vision Value, but without the injunction Vision Value will continue to use Dr. Tavel's

mark and may attract customers familiar with the Tavel name, thereby acquiring business and the goodwill that belongs to Tavel. Further, Tavel has demonstrated consumer confusion and customer dissatisfaction Vision Value that could reflect poorly on Tavel, causing incalculable economic loss, damaging good will, and tarnishing Tavel's mark.

Vision Value no doubt will incur expenses if the injunction is issued: signage and advertising would have to be changed, as would telephone and Internet listings. No evidence was introduced as to the extent of those expenses. Business may well be lost if, for example, customers, whose interest in Vision Value began with a Vision Value advertisement, are unable to find the renamed business. Still, the injunction wouldn't shut Vision Value down or force it out of business—it would require only that the company cease using the Vision Value name in Indiana. Further, just as Vision Value argued unpersuasively that Tavel is causing its own injury by continuing to use the mark, Vision Value chose to use the Vision Value name after being notified of Tavel's intent to protect its mark. Far more than Tavel, Vision Value has caused its own harm.

The balance of harms favors issuance of the requested injunction.

D

"The final factor to be considered in conjunction with a preliminary injunction is the public interest, which is the effect that granting or denying the

17

injunction will have on nonparties." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1121 (7th Cir. 1997).

Tavel says preventing trademark infringement and requiring parties to compete fairly would have no negative impact on the public. Vision Value didn't address this factor, but alluded to the affect of an injunction of this sort on First Amendment rights. The Lanham Act, though, only regulates commercial speech, which is understood today as being entitled to reduced protections under the First Amendment. *See* Florida Bar v. Went For It, Inc., 515 U.S. 618, 623 (1995) ("Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of non-commercial expression."); Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 563-564 (1980) ("[O]ur decisions have recognized the common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. . . . The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. . . . The government may ban forms of communication more likely to deceive the public than to inform it."). In addition, "[t]rademark rights promote the aims of the first amendment by enabling producers of the spoken and written word to differentiate themselves. If multiple businesses use the same (or confusingly similar names), the result is cacophony rather than discussion of debate. If every candidate on the

18

ballot ran under the same name, this would do more to befuddle the voters than to promote the candidates' freedom of expression." Te-Ta-Ma Truth Foundation-Family of URI, Inc. v. World Church of the Creator, 297 F.3d 662, 667 (7th Cir. 2002). The requested injunction would leave the First Amendment unbruised.

The requested injunction would serve the public interest by reducing consumer confusion in the marketplace. Although neither party addressed the sophistication of its customer base, there appears to be a strong likelihood of consumer confusion, which weighs in favor of issuance of the injunction.

E

Each factor favors issuance of the injunction Tavel seeks, at least with respect to Indiana. Neither party addressed the issue of a bond. "When setting the amount of security, district courts should err on the high side. . . . Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." Mead Johnson & Co. v. Abbott Laboratories, 201 F.3d 883, 888 (7th Cir. 2000). Without evidence or input from the parties, though, courts should not be expected to identify the high side unerringly. Given what the record contains, the court fixes the bond at $50,000.

III

For the foregoing reasons, the court GRANTS the plaintiff's motion for preliminary injunction. The defendant Vision Value LLC, f/k/a Eyeglass Express, its owners, officers, directors, agents, employees, successors, assigns, and all those controlled by them, or in active concert or participation with them, are prohibited from using "Vision Value" or "Vision Values" or a substantially similar word or phrase, in any public forum in or directed to Indiana, including but not limited to signage, telephone directories, billboards, broadcast advertisements, newspaper advertisements, or as a corporate name, trademark, service mark, or assumed name.

This order shall become effective upon the plaintiff's posting with the clerk of the court the sum of, or a surety for, $50,000 to serve as bond for the injunction, and shall remain in effect until dissolved or converted into a permanent injunction.

SO ORDERED.

ENTERED:   November 1, 2007

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court